[No. 25955-9-II. Division Two. February 1, 2002.]

MARK A. VALERIO, *Appellant*, v. LACEY POLICE DEPARTMENT, ET AL., *Respondents*.

164

*Rodney G. Franzen*, for appellant.

*W. Dale Kamerrer* (of *Law, Lyman, Daniel, Kamerrer & Bogdanovich*) and *Kenneth R. Ahlf, City Attorney*, and *Joseph M. Svoboda, Assistant*, for respondents.

Hunt, J. — Mark A. Valerio appeals the RCW 69.50.505 forfeiture of $58,300 cash that was found in the trunk of his girl friend's car and turned over to the City of Lacey Police Department. Valerio argues that (1) the forfeiture hearing was untimely; (2) the city failed to prove that he used or intended to use the money for an illegal drug business; and (3) RCW 69.50.505 is unconstitutionally overbroad as applied here. Finding no probable cause for forfeiture of the seized money, we reverse.

FACTS

I. SEIZURE OF UNEXPLAINED CASH

On November 12, 1998, Valerio asked his friend Johnny Morton to "hold onto" a safe containing a large amount of money in plastic bags. Morton declined. That evening, Valerio drove home in his girl friend's [Victoria Messman] car, where police arrested him for a domestic violence assault against Messman earlier that day.

The next morning, Messman's brother, Roy Benson, helped her move from the residence that she had been

sharing with Valerio. Benson found a locked safe in the back of her vehicle. Benson and his mother, Annieta Winston, opened the safe, discovered $58,300 cash, and took the safe and the money to the City of Lacey Police Department. Winston reported that she believed the money belonged to Valerio.

Detective Joe Upton questioned Valerio about the money. Valerio said that he was not the last person to have driven the vehicle, he knew nothing about the safe, and he did not want to incriminate himself. Upton noticed that some of the money had a musty odor.

The city police asked Nisqually Police Department Officer Carl Mealing and drug-detecting dog Zandy for assistance. Zandy has been trained to detect the odor of cocaine, heroin, marijuana, methamphetamines, and hashish; Zandy can also detect controlled substances odor that may have transferred from another item stored in the same evidence locker.[1] Zandy indicates a positive find of a controlled substance by placing her nose on the area where the item is located and sitting down.

Two times in two separate offices, city police hid the plastic-bagged money that Winston had turned in; both times, Zandy indicated a positive find. When the State Crime Laboratory tested the money for controlled substance residue, the result was inconclusive.

City police searched Valerio's home but recovered no evidence of controlled substances, drug paraphernalia, or any other evidence of drug dealing. Valerio had no criminal history involving drugs. Messman said that she had never known Valerio to use, to manufacture, to possess, or to deliver illegal drugs or drug paraphernalia. But she told Officer Chris Ward that Valerio had mentioned starting a drug-related business, that there would be a lot of money, and that it would never be at their residence or around the children.

---

[1] Valerio asserts that because the money was stored in a police evidence locker, the money may have picked up the controlled substances scent while in the city's custody.

## II. FORFEITURE

Neither the State nor the City of Lacey charged Valerio with a crime related to the money from the safe. The city, however, initiated a hearing under RCW 69.50.505 to forfeit the money as proceeds of, or intended for use in, illegal drug transactions. Although neither Morton nor Valerio had yet claimed ownership of the money, the city sent them forfeiture notices on November 19, 1998. Only Valerio responded, on December 28, 1999.

### A. REMOVAL TO SUPERIOR COURT

On January 27, 1999, Valerio filed a Complaint and Petition for Removal of Forfeiture Action in Thurston County Superior Court. The court set a status conference[2] for April 2, 1999, which it continued to April 16, 1999. The forfeiture hearing began on May 7, 1999. Finding that the forfeiture hearing was timely held, the trial court denied Valerio's motions to dismiss.

### B. PROBABLE CAUSE HEARING

Valerio testified that he had accumulated the $58,300 over several years. Messman testified that she had given Valerio approximately $5,880. In June 1998, Valerio and Messman had cosigned a note for approximately $6,080, using Messman's 1991 Honda Accord as collateral (Resp't Ex. No. 7); they had used $1,590 of the loan proceeds to pay off a preexisting loan from O'Bee Credit Union. (Resp't Ex. No. 19.) For the years 1995 through 1998, Valerio did not report to the IRS an annual income of more than $5,890. (Resp't Ex. Nos. 14-16.) Nor did he keep records of his past

---

[2] Thurston County Local Civil Rule 16(d) provides in pertinent part: "A status conference shall be held in each case subject to this rule. The purpose of the status conference is to address all issues in the Case Schedule Order and to enter the Order."

gambling winnings or losses.[3] (Resp't Exs. Nos. 12, 14-17, and 18.)

The superior court ruled that there was probable cause for the city to have seized the money because: (1) the bills appeared to be new and uncirculated; (2) Valerio did not immediately claim ownership; (3) other innocent explanations for the money were not credible; (4) Messman said that Valerio had mentioned the possibility of large amounts of money, possibly from a drug-related business; and (5) a drug-sniffing dog alerted to the money. Clerk's Papers at 9. The trial court later noted that at this point, "[T]he burden shifted to Mr. Valerio to present evidence to satisfy a burden by the preponderance of evidence that he had acquired the property in some manner other than in violation of RCW 69.50.505." Oral Op., Report of Proceedings (RP) at 9.

## C. Forfeiture Finding: Seized Money was Drug-Dealing Proceeds or Future Capital

Following the forfeiture hearing, the trial court found that the money had been "accumulated and held in violation of RCW 69.50.505" and ordered its forfeiture. Oral Op., RP at 4. The trial court also found that Valerio had not met his burden of proving by a preponderance of the evidence that the funds had come from a lawful source.

Before rendering its oral opinion, the court noted that the money had a "musty odor" and only one of the bills had been issued before 1996.

The court then recited the following evidence to support its ruling: (1) Initially no one claimed the money, and Valerio had said he knew nothing about it. (2) Valerio's testimony on direct examination that he had virtually no expenses (to offset money earned or gifted) was not reasonable, especially in light of expenses, such as child care, that he acknowledged on cross-examination. (3) Although Valerio said that he distrusted banks, he had used banks

---

[3] After this forfeiture procedure began, Valerio reported $16,000 in gambling winnings on his 1998 tax return. (Resp't Ex. No. 12)

since he was a teenager. (4) Valerio was experienced in the use of credit cards to pay off debts. (5) Valerio could not have accumulated this large amount of money in the manner he described. (6) Valerio did not have significant gambling winnings. (7) Valerio had earned approximately $121 per week from 1995 to 1998, and these amounts did not explain accumulation of the large sum of money. (8) "The investigation conducted by police officers at the time that the money was discovered tended to exclude other explanations." Oral Op., RP at 6.

The trial court also listed two other significant items of evidence. First were Valerio's hearsay statements to Messman, his live-in companion and mother of his child,

that Mr. Valerio would be coming into large amounts of money; that the reason for that money had something to do with the drug trade, and that he would not involve his family—Ms. Messman, his child, and the other members of his family—in the business or these transactions in any way, and that no people associated with those transactions would come around the house.

Oral Op., RP at 7. Second was the dog's "olfactory conclusion":

[T]he dog gave an immediate reaction at the time of entering the threshold of the office. In other words, he didn't wait until he was in close proximity of the drugs. Rather . . . coming to the entrance to the chief's office [the dog] began a series of reactions indicating his *olfactory conclusion* that there were drugs somewhere in his presence, and as he proceeded around the office until he came to the place where the drugs were hidden, that reaction increased in intensity until he gave his sit-down reaction to the close proximity of drugs, and which he did exactly where they were found.

Both the handler and the police officer who witnessed this, Detective Ward, described the reaction of the dog as strong and immediate.

Oral Op., RP at 8-9 (emphasis added). The court also entered written Findings of Fact, Conclusions of Law, a Judgment, and an Order of Forfeiture, consistent with its oral decision.

The trial court further clarified its opinion by noting that the money was "used or intended to be used to facilitate any [controlled substances] violation." Oral Op., RP at 17. The court candidly went on to explain its reasoning:

And I will tell you that in my analysis, if you wish it for the record, the phrase "used or intended to be used," was a phrase that caused me some concern. Clearly the evidence of the dog and the evidence of drug residue on the money *suggested* that it had been used. The statements by Mr. Valerio to Ms. Messman were of intention to enter that business. *Whether this money was the result of a drug transaction in which Mr. Valerio participated or whether he was accumulating it to enter other drug transactions is difficult for me to say,* based upon this evidence. But where the statute is so broadly stated that it says, "used or intended to be used," I concluded that the evidence satisfied that standard.

Oral Op., RP at 18-19 (emphasis added).

When defense counsel asked if the court was finding that all $58,000 of the money was subject to forfeiture under this finding, the court replied:

My reading of this statute is that where the claimant makes no attempt to segregate the funds, that a single fund of money gathered as it was here, where even some part of it had been used or intended to be used in violation of the statute, then the entire fund is subject to seizure and forfeiture and the burden remains upon the claimant to establish what parts, if any, can be segregated from the rest that remain subject to seizure. Here there was, of course, no evidence of that at all.

Oral Op., RP at 19-20. The court further explained that because the city was presented with the money as a single bundle, it did not have to prove that it all came from the same source.

### D. REJECTION OF VALERIO'S EXPLANATIONS FOR LAWFUL ACCUMULATION

Before rejecting Valerio's explanations as to how he had accumulated this much money, the court noted that at first,

on direct examination, it had found these explanations plausible. But

> cross-examination showed quite a different pattern of expenditure of money. At times he would deny that he had spent money. Other times he was offhandedly candid in the types of money he spent and what they did. His reference to the expenses of raising their child, for instance, as a source where his money went was not something that I heard on direct examination . . . .

Oral Op., RP at 11. The trial court also noted several items that it found "troubling": (1) no evidence that Valerio was a drug user or involved in the "drug culture"; (2) no evidence of what transaction was the source of the money, drug or otherwise; (3) no evidence suggesting "why the money had the scent of drugs and was discovered by the drug dog"; and (4) "no specific transaction that one can point to and say that this was what Mr. Valerio was talking about in his conversations with Vicky Messman." Oral Op., RP at 15-16.

But the court went on to explain that such missing evidence was not necessary to forfeiture in this case.

> The courts have contemplated that these would not be clear-cut cases in every instance. Where there is a transaction, where money is seized as part of a transaction, the issue becomes clear and it is not necessary to go through this process in most cases. *This was a close case*, but given the sum of the evidence presented to me and considered in its totality with the shifting burdens of proof, I am satisfied here and so conclude that the seizure by the city is approved and the forfeiture is ordered.

Oral Op., RP at 16 (emphasis added).

ANALYSIS

I. TIMELINESS

Valerio first contends that the forfeiture hearing should have begun within 90 days of his claim of ownership, March 28, 1999. He argues that the forfeiture proceeding was

illegal because it did not begin until May 7, 1999. We disagree.

RCW 69.50.505 provides that law enforcement may seize property when probable cause exists to believe that the property is intended to be used for illegal drug activity or represents proceeds of illegal drug sales.[4] Within 15 days of the seizure, the seizing agency must provide notice to any interested persons. RCW 69.50.505(c). A person claiming an interest in seized personal property must notify the seizing agency within 45 days. RCW 69.50.505(e). A person filing timely notice "shall be afforded a reasonable opportunity to be heard as to the claim or right"; but the statute does not specify when this hearing must commence. RCW 69.50.505(e). But RCW 69.50.505(c) provides that "proceedings for forfeiture shall be deemed commenced by the seizure." *See also* RCW 34.05.413(5), which permits commencement of forfeiture upon notice of a future hearing, which here occurred on November 19, 1998.

Valerio asserted ownership of the seized money on December 28, 1998. He argues that the forfeiture hearing should have started within 90 days of January 29, 1999, on or before March 28, 1999,[5] citing *Tellevik v. 31641 West Rutherford Street*, 120 Wn.2d 68, 838 P.2d 111 (1992) (*Tellevik* I); *Tellevik v. 31641 West Rutherford Street*, 125 Wn.2d 364, 884 P.2d 1319 (1994) (*Tellevik* II); and *Espinoza v. City of Everett*, 87 Wn. App. 857, 865-66, 869, 943 P.2d 387 (1997).

---

[4] RCW 69.50.505(e) provides:

If any person notifies the seizing law enforcement agency in writing of the person's claim of ownership or right to possession of items specified in subsection (a)(2), (a)(3), (a)(4), (a)(5), (a)(6), (a)(7), or (a)(8) of this section within forty-five days of the seizure in the case of personal property and ninety days in the case of real property, the person or persons shall be afforded a reasonable opportunity to be heard as to the claim or right.

[5] Valerio petitioned for removal on January 26, 1999, and notified the City on January 29, 1999. Valerio asserts that the hearing should have commenced by March 28, 1999, based on *Espinoza v. City of Everett*, 87 Wn. App. 857, 865-66, 869, 943 P.2d 387 (1997) (four and one-half year delay between seizure and forfeiture hearing). *See* n.6, *infra*.

## A. CLAIMANT-CAUSED DELAY

 Valerio's argument ignores that his request for removal from municipal to superior court caused postponement of the hearing and took scheduling control away from the City. He cannot now complain about a delay that he precipitated. Moreover, neither the *Tellevik* cases nor *Espinoza* address a claimant-initiated removal delay such as the one here. In contrast, *Espinoza* focuses on *government-caused* delay of significantly longer duration—four and a half years.

Instead, a more analogous case also originates in Division One of this court—*City of Des Moines v. Personal Property Identified as $81,231 in U.S. Currency*, 87 Wn. App. 689, 943 P.2d 669 (1997). The City of Des Moines filed a forfeiture action in municipal court. On the day set for the hearing, the claimant removed the action to superior court, where trial was set within 90 days of the removal. The day before the scheduled trial date, the court continued the hearing for three months, over the claimant's objection, in order to address several issues. Division One held that the continuance was valid, explaining that the Supreme Court did not intend in *Tellevik* I to suspend the Rules of Civil Procedure for forfeiture cases. Rather, the superior court rules govern superior court forfeiture actions, including related due process and continuance issues. *City of Des Moines*, 87 Wn. App. at 696, 698-700.[6]

## B. COMMENCEMENT OF FORFEITURE

Even were we to apply *Espinoza* here, there would be no violation. RCW 34.05.413(5) provides: "An adjudicative proceeding commences when the agency or a presiding officer notifies a party that a prehearing conference, hearing, or other stage of an adjudicative proceeding will be conducted." Applying this provision, Division One held that the 90-day hearing requirement derived from this section is

---

[6] We note that Division One did not comment on *City of Des Moines* in *Espinoza*.

fulfilled and due process is satisfied when the seizing agency notifies the claimant within the 90-day period that *some stage* of the hearing will be conducted, unless the claimant shows prejudice. *In re Forfeiture of One 1988 Black Chevrolet Corvette Auto.*, 91 Wn. App. 320, 324, 963 P.2d 187 (1997), adopting the balancing test from *United States v. Eight Thousand Eight Hundred and Fifty Dollars ($8,850) in U.S. Currency*, 461 U.S. 555, 103 S. Ct. 2005, 76 L. Ed. 2d 143 (1983). In other words, the hearing "commences" when the agency or hearing officer notifies a claimant that some stage of the hearing will be conducted. *Black Corvette*, 91 Wn. App. at 323.

We adopt Division One's rationale in *Black Corvette* and consider Valerio's due process timeliness challenges based on (1) the claimant's assertions of the right to a hearing; (2) the reason for the delay; (3) the length of the delay; and (4) whether the delay caused any prejudice to the claimant. Applying the *$8,850* balancing test here, Valerio's removal request was the prime reason for the delay, which was not long, did not compromise his right to a hearing, and caused no significant prejudice to him.

Here, Valerio himself precipitated the two and one-half month delay. He could have had an administrative hearing in municipal court within 90 days after December 28, 1998. *See Espinoza*, 87 Wn. App. at 865-66, 869. Instead, he chose to abandon the municipal court and to seek removal of the forfeiture action to superior court on January 27, 1999. That same day, the superior court set a status conference for April 2, 1999, slightly more than two months hence. Moreover, a court may continue a forfeiture hearing to accommodate the parties' needs. *See City of Des Moines*, 87 Wn. App. at 698-700. On both April 16, 1999,[7] and again on May 7, 1999,[8] the superior court heard and denied Valerio's motions to dismiss the forfeiture hearing as untimely. On May 7, the superior court also began the hearing on the

---

[7] 80 days after removal April 16, 1999 (RP at 7).

[8] 101 days after removal May 7, 1999 (RP at 19).

forfeiture issues. Valerio has not shown that the superior court could have set an earlier date or that the hearing was not conducted within a reasonable period based on the superior court calendar.[9]

The city notified Valerio of its seizure and intent to forfeit the money within 90 days of receiving his claim of ownership, thus satisfying the 90-day requirement at the outset. *Black Corvette*, 91 Wn. App. at 323-24. His subsequent removal of the forfeiture proceedings to superior court, with its attendant delay, did not render the hearing untimely or unfair.

## II. INSUFFICIENT EVIDENCE TO SUPPORT FORFEITURE

Valerio argues that the evidence is insufficient to support forfeiture of the $58,300 seized from the safe in Messman's car. We agree.

RCW 69.50.505 provides:

(a) The following are subject to seizure and forfeiture and no property right exists in them:

. . . .

(7) All moneys, negotiable instruments, securities, or other tangible or intangible property of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this chapter or chapter 69.41 or 69.52 RCW, all tangible or intangible personal property, proceeds, or assets acquired in whole or in part with proceeds traceable to an exchange or series of exchanges in violation of this chapter or chapter 69.41 or 69.52 RCW, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this chapter or chapter 69.41 or 69.52 RCW.[10]

---

[9] Unlike in *Espinoza*, the trial court here did not act egregiously in handling the hearing. The court continued the first status conference until April 16, 1999, and ultimately completed the hearing in a timely fashion.

[10] Similarly, 21 U.S.C. § 881 provides:

*(a) Subject property*

██ The purpose of forfeiture proceedings is to punish individuals who participate in the illegal dealing of controlled substances. *Deeter v. Smith*, 106 Wn.2d 376, 378, 721 P.2d 519 (1986). A seizing agency has the initial burden of showing probable cause to believe that seized items were the proceeds of or intended to be used in illegal drug activities. *Barlindal v. City of Bonney Lake*, 84 Wn. App. 135, 141, 925 P.2d 1289 (1996) (citing *Rozner v. City of Bellevue*, 116 Wn.2d 342, 350, 804 P.2d 24 (1991)); RCW 69.50.505(b)(4). Once the seizing agency establishes probable cause to seize the item, the burden shifts to the claimant to prove by a preponderance of the evidence either that the property was not used or intended to be in an illegal drug activity, or that it was used without the owner's consent or knowledge. *Adams County v. One 1978 Blue Ford Bronco*, 74 Wn. App. 702, 706, 875 P.2d 690 (1994).

A. PROBABLE CAUSE

██ Under Washington forfeiture law, " '[p]robable cause requires the existence of reasonable grounds for suspicion supported by circumstances sufficiently strong to warrant a person of ordinary caution in the belief.' " that the property was used or intended to be used in violation of

---

The following *shall be* subject to forfeiture *to the United States* and no property right *shall* exist in them:

. . . .

(6) All moneys, negotiable instruments, securities, or other *things* of value furnished or intended to be furnished by any person in exchange for a controlled substance *or listed chemical* in violation of this *subchapter*, all proceeds traceable to *such* an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

Washington's civil forfeiture statute, RCW 69.50.505, originally enacted in 1971, is a section of the Uniform Controlled Substances Act. The Uniform Controlled Substances Act is based on the federal Controlled Substances Act. Pub. L. No. 91-513, 21 U.S.C. §§ 801-904 (1970). (Uniform Controlled Substances Act's purpose is to achieve uniformity between state and federal drug laws and to provide an interlocking trellis of laws dealing with drug abuse). The state and federal forfeiture statutes are substantially similar in wording.

the Uniform Controlled Substances Act (UCSA).[11] *Barlindal*, 84 Wn. App. at 141 (quoting *1978 Blue Ford Bronco*, 74 Wn. App. at 706); *Escamilla v. Tri-City Metro Drug Task Force*, 100 Wn. App. 742, 999 P.2d 625 (2000).[12] As Division One explained,

> [T]he first step in the analysis asks whether the officers had probable cause to believe that the vehicle was "used, or intended for use, *in any manner* to facilitate the sale" of methamphetamine. . . . RCW 69.50.505(a)(4). "A finding of probable cause means a reasonable basis to act has been demonstrated." *Rozner v. Bellevue*, 56 Wn. App. 525, 531, 784 P.2d 537 (1990), *rev'd on other grounds*, 116 Wn.2d 342, 804 P.2d 24 (1991).

*City of Lynnwood v. $128 Cash*, 61 Wn. App. 505, 514, 810 P.2d 1377 (1991).

Here, the trial court recited the following facts to support its finding of probable cause to believe that the seized money was furnished or intended to be furnished in exchange for controlled substances in violation of chapter 69.50 RCW:

---

[11] In contrast, under federal forfeiture law, the government must establish reasonable ground for belief of connection to illegality supported by less than prima facie proof but more than mere suspicion; probable cause exists if the government demonstrates a nexus between the seized property and the illegal drug activity. *United States v. $87,118.00 in U.S. Currency*, 95 F.3d 511 (7th Cir. 1996). *See also United States v. $22,474.00 in U.S. Currency*, 246 F.3d 1212 (9th Cir. 2001); *United States v. Twenty-Two Thousand, Two Hundred Eighty Seven Dollars ($22,287.00), U.S. Currency*, 709 F.2d 442 (6th Cir. 1983); *United States v. Daccarett*, 6 F.3d 37 (2d Cir. 1993).

Probable cause to forfeit money on ground that it was used or intended to be used in exchange for illegal controlled substances cannot be shown unless the aggregated facts give rise to more than a mere suspicion that the property was exchanged for or intended to be exchanged for drugs. The presence or absence of any single fact is not dispositive and circumstantial evidence of drug transactions may support establishment of probable cause. But more than mere existence of a large amount of cash is required to establish the requisite connection. *United States v. Padilla*, 888 F.2d 642 (9th Cir. 1989).

[12] *See also Cruz v. Grant County Sheriff's Office*, 74 Wn. App. 490, 495, 873 P.2d 1211 (1994) (Prima facie showing is not required, merely reasonable cause for suspicion supporting probable cause.).

(1) The money was new $100 bills that were packaged in a particular way and had not been in general circulation;[13]

(2) There was no immediate claim of ownership and in fact a denial by the person believed to be the owner, Valerio;[14]

(3) The evidence tended to exclude other explanations for the money, including the two persons who were a family unit, Ms. Messman and Valerio, showing no evidence to support that amount of cash;

(4) Statements from Ms. Messman, about drugs, large amounts of money, and that the business would not involve the family or be in proximity to the family; and,

(5) A positive and strong connection between drugs and the money, recognized by the drug sniffing dog.

Clerk's Papers at 9. We examine these findings to determine whether sufficient evidence supports them. *See Clarke v. Shoreline Sch. Dist. No. 412,* 106 Wn.2d 102, 109-10, 720 P.2d 793 (1986). We conclude that they are insufficient to support probable cause for forfeiture under the statute.

We compare the facts here with Division One's affirmance of a vehicle forfeiture in *$128 Cash,* 61 Wn. App. 505. In that case, there was ample physical and testimonial evidence that the defendant, Heeter, was heavily involved in the manufacture and sale of methamphetamine and that he used his vehicle for transport in connection with this

---

[13] *But see United States v. $70,000 U.S. Currency,* 826 F. Supp. 730 (S.D.N.Y. 1993) (mere fact that currency in small denominations was found in proximity to marijuana in vehicle was insufficient to meet government's burden of establishing probable cause for forfeiture).

[14] *But see United States v. $49,576.00 U.S. Currency,* 116 F.3d 425 (9th Cir. 1997) (claimant's use of fake driver's license, his evasive and dishonest answers to questions, and his general nervous behavior when questioned at airport were indicative of some illegal activity, but not necessarily indicative of drug trafficking; could not establish probable cause to believe that money in claimant's bag was involved in drug transaction, as basis for forfeiture); *United States v. $5000.00 in U.S. Currency,* 40 F.3d 846 (6th Cir. 1994) (United States failed to establish probable cause to support forfeiture of $5,000 in currency carried on person of one claimant at airport and $9,750 carried in luggage of other claimant, though one claimant matched, to the extent of being a well-dressed black man wearing glasses, drug courier description provided by anonymous caller, claimants had traveled to New York for single day and large amount of currency was found in bundles and wrapped with rubber bands, narcotics detection dog alerted to the money, one claimant lied about the purpose of his trip, and other claimant had pleaded guilty to state drug charges more than six years earlier).

illegal business. Not only did the police have a search warrant for Heeter's residence, where they seized evidence of his ongoing drug business, but also both his residence and his vehicle reeked of a "cat urine" smell associated with methamphetamine manufacture. *$128 Cash*, 61 Wn. App. at 508.

In contrast, here, there is no clear evidence that Valerio was, or was about to become, involved in illegal drug sales. Rather, his estranged girl friend's speculation that he might be planning to engage in drug-related activity was based on a vague conversation she had with Valerio; she had no actual knowledge of his involvement with any drug business, past, present, or future. Moreover, unlike Heeter, Valerio was not known to use, to manufacture, or to sell illegal drugs. And he had no criminal record.

Furthermore, Messman's testimony tended to support Valerio's explanation that the money was derived from legal sources. The record does not show that illegal drug activities were the reason that the cash was new, uncirculated, and of the same denomination. Although the trial court believed that the money's condition indicated drug dealing, the record does not show why the money's condition was not also consistent with gambling, in which Valerio frequently engaged. The State's evidence, that Valerio's gambling winnings and losses or income and savings could not have produced this *amount* of cash,[15] did not establish probable cause to believe that the money was, therefore, the product of an illegal drug business.[16]

Aside from Messman's speculation, the only evidence of a possible connection between the money and illegal drugs was the drug-sniffing dog's "opinion" that the money had

---

[15] *See United States v. One Hundred Thirty Thousand Fifty-Two Dollars ($130,052.00) in U.S. Currency*, 909 F. Supp. 1506, 1516 (M.D. Ala. 1995), *aff'd* 103 F.3d 148 (11th Cir. 1996) (large amount of currency alone is insufficient to establish probable cause for civil forfeiture based on controlled substances transactions; rather, there must be some evidence connecting large sum of money to illegal exchange of controlled substance).

[16] Valerio was a dealer for casinos, where he had the cashiers convert money to $100 bills.

absorbed the odor of illegal drugs. Again, however, the dog's "testimony" did not and could not indicate how the odor transferred to the money. Thus, the dog-sniff evidence did not establish probable cause for the officers to believe that the money had been used in connection with the drug business because: (1) the money had been stored for four days in a city police department safe, where the money could have absorbed controlled substances odors from other evidence stored in the same safe; (2) according to the dog's handler, the dog could have reacted to such absorbed odors;[17] (3) there was no evidence that this dog had been trained to differentiate between odors absorbed from contact with drugs as opposed to odors absorbed from other sources;[18] (4) there are trace amounts of controlled substances on virtually all circulated U.S. currency;[19] and (5) the state crime lab could not confirm the presence of traces of illegal drugs on the money.

Courts have not found probable cause to support forfeiture in cases with even clearer drug-related circumstances than those here. For example, in *United States v. $49,576.00 U.S. Currency*, 116 F.3d 425 (9th Cir. 1997), a drug-detection dog alerted to currency, the claimant fit a drug-courier profile, he gave evasive and dishonest answers to officers' questions, and he had once been detained, but not charged, in connection with a drug-related crime. *$49,576.00*, 116 F.3d at 427. Nonetheless, the Ninth Circuit

---

[17] In contrast, in *United States v. U.S. Currency, $30,060.00*, 39 F.3d 1039 (9th Cir. 1994) there was evidence that unless the money had recently been in the proximity of cocaine, the detection dog would not have alerted to it. *$22,474.00*, 246 F.3d at 1216.

[18] In contrast, in *$22,474.00*, 246 F.3d 1212, the sniffer-dog who alerted to the claimant's currency was trained *not* to alert to cocaine residue found on currency in general circulation. Rather, the dog was trained to, and would only, alert to the odor of a chemical by-product of cocaine called methylbenzoate. Moreover, the government provided evidence that unless the currency the defendant was carrying had recently been in the proximity of cocaine, the detection dog would not have alerted to it. *$22,474.00*, 246 F.3d at 1216. The claimant had also previously been convicted of trafficking cocaine. The court found a sufficient nexus linking the incriminating circumstances to illegal drugs.

[19] In both *$30,060.00* and in our case here, the dog alerted to the presence of a controlled substance scent on the money, with no evidence of ability to differentiate as to the origin of the scent as was the case with the dog in *$22,474.00, supra*.

held that the circumstances established probable cause to believe only that the claimant was involved in *some illegal activity*; but there was no evidence connecting that activity with narcotics and, thus, no basis for forfeiture under the drug statute. The drug-sniffing dog's alert in *$49,576.00* was not sufficient to support forfeiture, even when coupled with the claimant's drug-courier profile and other evidence.[20] *Id.* at 428.

Here, however, Valerio had no known prior involvement with illegal drugs. Moreover, he explained that his intent, when conversing earlier with Messman, had been to start a legal marijuana business if legalized by a proposed voter-initiative.[21] The record does not show that the dog sniffed actual traces of illegal drugs on the seized money (which presumably would have indicated prior contact between the money and drugs). Rather the record shows only that the dog alerted to mere odors, which the money could have absorbed from sources other than contact with drugs.[22]

---

[20] Compare Division Three's affirmance of forfeiture of a Ford Bronco used to transport cocaine where there was also evidence that the claimant had been involved in prior cocaine sales, a drug-sniffing dog alerted to the odor of narcotics in luggage compartment of vehicle, and narcotics were found on the premises. *1978 Blue Ford Bronco*, 74 Wn. App. 702. The dog's sniff-alert alone, however, was not sufficient evidence to support a forfeiture. *Id.* at 707.

[21] In contrast, in *$22,474.00*, 246 F.3d 1212, the claimant admitted that he had been convicted of trafficking cocaine. This, coupled with a sophisticated dog sniff (*see* n.19, *supra*), was sufficient to establish a nexus specifically linking the incriminating circumstances to illegal drugs. The claimant used cash to purchase a one-way ticket to Phoenix, a known source city for drugs; he was carrying a substantial sum of cash; he gave conflicting statements regarding the amount of money he was carrying, the origin of the money, and his reasons for visiting Phoenix; he was unable to answer simple questions about his last job, the address of the person he claimed to be visiting, and the name or location of the dealership where he intended to buy the Tahoe automobile he said he had come to Phoenix to buy; and his wife and sister-in-law contradicted his proffered reasons for visiting Phoenix. *$22,474.00*, 246 F.3d at 1216-17.

The court noted that none of the incriminating circumstances standing alone, nor the mere fact that the drug-detection dog had alerted to the money Mahone was carrying, was sufficient to establish probable cause to believe that the currency was connected with illegal drug activity. But the totality of the circumstances, particularly Mahone's admission that he had a prior conviction for drug trafficking, provided the necessary link. We do not have such a quantum of circumstances here.

[22] *See United States v. $40,000.00 in U.S. Currency*, 999 F. Supp. 234 (D.P.R. 1998) (government lacked probable cause to forfeit $40,000 seized from airline

Further, there was no independent evidence indicating that the money could have come into contact with illegal drugs while in Valerio's possession. *See United States v. Fifty-Three Thousand Eighty-Two Dollars in U.S. Currency, $53,082.00,* 985 F.2d 245, 250 (6th Cir. 1993) (while dog's alerting linked currency to controlled substances, it did not link the claimant's use of the currency to controlled substances).

Here, there was but mere suspicion, not a reasonable, factual basis for belief that the money had been used, or would be used in drug-dealing.[23] *Barlindal,* 84 Wn. App.

---

passenger, as traceable to illegal exchange of controlled substance; although there was positive dog sniff on currency, and claimant was traveling to and from destinations with well-known drug trafficking, purchased a one-way ticket in cash, and lacked documentation for source of money, claimant made no attempt to conceal currency, he purchased ticket in own name, and dog sniff could have resulted from contamination of currency).

[23] Compare with *$30,060.00,* 39 F.3d 1039 (evidence insufficient to establish probable cause that the money was connected to drugs, as required to warrant forfeiture under the narcotics forfeiture statute: (1) narcotics detection dog alerted to presence of controlled substance on money found in claimant's automobile during traffic stop; (2) money packaged in $1,000 bundles and corresponded to price of two kilograms of cocaine; and (3) claimant gave false accounts of the money's source and his own employment record. Claimant presented evidence that over 75 percent of the currency in the area was contaminated with residue of cocaine or other controlled substances. Government presented no other evidence connecting money to drugs. Forfeiture defeated.).

*United States v. $191,910.00 in U.S. Currency,* 16 F.3d 1051 (9th Cir. 1994) (no probable cause for forfeiture of currency seized from airplane passenger, on theory that currency was used or intended to be used in narcotics transaction where passenger admitted carrying between $15,000 and $20,000 in cash, x-ray of luggage revealed substantial sum of cash, and passenger's explanations to officers in different cities varied. Although government may have had suspicions of general criminal activity, it did not have probable cause to believe that currency was connected specifically to drug activities.).

*United States v. 2323 Charms Rd., Milford Township,* 726 F. Supp. 164 (E.D. Mich. 1989) (allegations in civil forfeiture complaint that claimant had prior drug contacts, that he owned aircraft, that he would use aircraft to import cocaine into southeastern Michigan, and that drug detection canine sniffed exterior and interior of aircraft and "alerted" to both were insufficient to show probable cause for forfeiture of aircraft or log books and personal property seized contemporaneously therewith; allegations concerning dog sniff were the only relevant allegations new to amended complaint, which did not allege that any drugs in any quantity were found in aircraft and offered no details regarding claimant's involvement in drug shipments other than listing year during which those shipments allegedly occurred).

135. Moreover, there apparently was insufficient probable cause to arrest Valerio for illegal drug dealing or possession. Accordingly, we hold that there was insufficient evidence to support the forfeiture.[24]

### III. CONSTITUTIONALITY

Because we reverse based on the lack of evidence to support the forfeiture, we do not address Valerio's constitutional challenges to the statute.

Reversed.

ARMSTRONG, C.J., and HOUGHTON, J., concur.

---

[24] *See United States v. Sixty-Eight Thousand Five Hundred Eighty Dollars ($68,580.00) in U.S. Currency*, 815 F. Supp. 1479 (M.D. Ga. 1993) (no probable cause for forfeiture of currency taken from claimant's automobile; while claimant was traveling on known drug route, acted nervous, was carrying small denomination bills, lied about identity of currency's owner, had criminal record, and had modest income according to his tax returns, there was no evidence of drugs or drug paraphernalia, and cash was not concealed).